UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CORIZON, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:10 CV 2430 DDN |
| ) | |
| WEXFORD HEALTH SOURCES, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This action is before the court on motions of plaintiff Corizon, Inc. and defendant Wexford Health Sources, Inc. for summary judgment and to strike the affidavit of Elaine Gedman. (Docs. 100, 105, 121.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 27.) The court heard oral argument on May 31, 2013.

**I.  BACKGROUND**

On December 23, 2010, plaintiff Corizon, Inc. commenced this action against defendant Wexford Health Services, Inc. (Doc. 1.) On June 12, 2012, plaintiff filed its fourth amended complaint. (Doc. 62.) In the amended complaint, plaintiff alleges two claims concerning the website http://www.cmsdoesnotcare.com against defendant: (1) false advertising and unfair competition under 15 U.S.C. § 1125(a) of the Lanham Act; and (2) common law unfair competition. (Id. at ¶ 1.) Plaintiff seeks compensatory damages for corrective advertising costs, attorney fees, and investigative fees spent to identify the creator of the website, an award of defendant's profits and unjust enrichment as a result of its wrongful conduct, injunctive relief, and punitive damages. (Id. at 6.)

## II.  MOTION FOR SUMMARY JUDGMENT

Plaintiff moves for summary judgment on both claims.  Defendant responds that plaintiff does not have constitutional or prudential standing due to lack of injury.  Defendant also responds that plaintiff failed to demonstrate that the website constitutes commercial advertising or the falsity of defendant's statements.  Defendant further responds that plaintiff failed to demonstrate materiality and deception and that these elements cannot be presumed.  (Docs. 112, 117.)

Defendant also moves for summary judgment on both claims, arguing that plaintiff lacks constitutional and prudential standing.  Defendant further argues that plaintiff failed to demonstrate injury, causation, materiality, deception, and that the website was commercial advertisement asserting false facts.  Defendant also argues against plaintiff's request for injunctive relief because it removed the website two years ago and has not engaged in further similar conduct towards plaintiff.  Plaintiff responds that injunctive relief barring future similar conduct by defendant remains proper due to defendant's past conduct.  (Docs. 101, 124.)

Plaintiff filed a motion to strike the affidavit of Elaine Gedman, which defendant filed in support of its motion for summary judgment, and requested that the court refrain from considering the affidavit for purposes of summary judgment.  (Doc. 121.)  Because the court found the affidavit unnecessary to resolve the issues raised in the motions for summary judgment, the court denies the motion to strike as moot.

## III. FACTUAL BACKGROUND

Defendant Wexford Health Sources, Inc. and plaintiff Corizon, Inc. conduct business in the industry of healthcare services for correctional facilities and compete for contracts across the country.  (Doc. 62 at ¶ 19; Doc. 93 at ¶ 19.)  On June 3, 2011, Correctional Medical Services, Inc., merged with Prison Health Services, Inc. to form Corizon, Inc.  (Doc. 102-2 at 27.)

In July 2005, plaintiff entered into a five-year contract with the state of Maryland, specifically, the Maryland Department of Public Safety and Correctional Services, to

provide medical services for correctional facilities. (Doc. 106-2 at 49.) Plaintiff and Maryland later agreed to extend the contract to December 2010. (Doc. 106-3 at 8.) In 2010, Maryland issued a request for contract bids for the provision of medical services and utilization management at Maryland correctional facilities. (Doc. 106-3 at 7-8.) Plaintiff and defendant both submitted bids. (Id. at 8-9.) In September 2010, Maryland announced its intent to award the contract to defendant. (Id. at 9.) By at least October 5, 2010, plaintiff formally protested the contract award. (Doc. 102-16 at 5.) On November 4, 2010, Maryland denied the protest. (Doc. 102-18.) Around November 9, 2010, plaintiff formally appealed the denial. (Doc. 102-19 at 3.) In late November 2010, plaintiff withdrew its appeal. (Doc. 120-11 at 6.) On November 28, 2010, Maryland informed defendant that, because defendant did not meet certain state requirements, Maryland withdrew its intent to award the contract. (Doc. 106-4 at 8.) On December 14, 2011, plaintiff and Maryland extended their contract through June 2011. (Doc. 102-30.) The contract was later extended through June 2012. (Doc. 102-3 at 20.)

In November 2010, defendant directed The CHT Group, a public relations firm, to create a website. (Doc. 106-6 at 9.) At defendant's request, Marlin Collingwood, the president of The CHT Group, registered the website at http://www.cmsdoesnotcare.com. (Id. at 9.) Defendant, specifically, its CEO Mark Hale and its president Marlin Collingwood, authored the website's statements. (Id. at 10; Doc. 106-5 at 5.) Defendant reviewed the website's content after its completion. (Doc. 102-11 at 9; Doc. 106-4 at 6-7.) The website was accessible from November 13, 2010 to May 23, 2011. (Doc. 62 at ¶ 15; Doc. 106-6 at 6.) The website, purportedly written by a Corizon insider, made statements about the manner in which plaintiff handled competitive contract bidding generally and with the contract award discussed above. (Doc. 102-14.) Among other things, the website lamented plaintiff's efforts to challenge the initial decision to award the contract to defendant, stating, for example, that:

(1) Plaintiff did not care about its customer, Maryland.

(2) Security officers repeatedly commented on plaintiff's failure to communicate or consider their needs.

  (3) Plaintiff did not care that its appeals incurred costs to Maryland.

  (4) Plaintiff directed its management to not cooperate with the transition of the healthcare services to defendant in several specified ways.

  (5) Plaintiff did not care about taxpayers in any state.

  (6) Plaintiff did not care about its employees or their families.

  (7) Plaintiff only cares about money.

(Id.)

  By November 16, 2010, plaintiff had discovered the website. (Doc. 102-29.) Soon thereafter, plaintiff engaged forensic accountants to analyze publicly available information. (Doc. 106-8 at ¶ 1.)[1] Further, plaintiff engaged counsel to commence this judicial action against a John Doe defendant and subpoenaed information from Yahoo.com and GoDaddy.com. (Id. at ¶ 2.) Plaintiff later subpoenaed information from AT&T, Verizon, and Marlin Collingwood. (Id. at ¶ 5.)

  Further, in November 2010, a person using the username "jgelfield" posted three comments on the Yahoo! Finance web page for American Service Group, Inc., the parent company of Prison Health Services, Inc. (Doc. 106-8 at 3.) The posts complained about the merger pending between Correctional Medical Services, Inc. and Prison Health Services, Inc. and linked to the http://www.cmsdoesnotcare.com website. (Id.) The postings originated from an internet provider address registered to the CHT Group and from a Hampton Inn in Mercer, Pennsylvania. (Doc. 106-7 at 8-12.) Marlin Collingwood used the internet provider address at the Hampton Inn. (Id.)

  On April 30, 2011, the CHT Group posted a website regarding the merger between Correctional Medical Services, Inc. and Prison Health Services, Inc. that was also created at defendant's direction. (Doc. 106-7 at 20-21; Doc. 106-8 at ¶ 7.) The website, http://www.phscmergerconcerns.com, questioned the consolidated entity's size, company

---

[1] Defendant objects to this fact, arguing that plaintiff did not need to engage forensic accountants to identify the creator of the website. (Doc. 118-29 at ¶ 29.) However, the fact as stated above is not disputed.

culture, dual headquarters, systematic redundancies, effect on the industry, and private ownership. (Doc. 106-8 at 13-18.) The removal of the website followed the completion of the merger. (Doc. 106-6 at 30-31.)

## IV.  SUMMARY JUDGMENT STANDARD

Courts grant summary judgment when the pleadings and proffered evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party. Rademacher v. HBE Corp., 645 F.3d 1005, 1010 (8th Cir. 2011). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 379 (2007).

## V. DISCUSSION

Plaintiff alleges claims of false advertising under Missouri common law and the Lanham Act. To prevail on a claim of false advertising under the Lanham Act, a plaintiff must show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

Buetow v. A.L.S. Enterprises, Inc., 650 F.3d 1178, 1182 (8th Cir. 2011). False advertising claims require proof of the same elements under both the Missouri common

law and the Lanham Act.  Children's Factory, Inc. v. Benee's Toys, Inc., 160 F.3d 489 (8th Cir. 1998).

Plaintiff argues that it has satisfied the standard for summary judgment for each element, and defendant argues that plaintiff has failed to demonstrate each of these elements sufficient to avoid summary judgment in favor of defendant.  Defendant also argues that plaintiff does not have constitutional or prudential standing and that plaintiff's request for injunctive relief is moot.

**A. Standing**

Defendant argues that plaintiff lacks constitutional and prudential standing. Constitutional standing requires: (1) injury in fact, (2) causal connection between the injury and the defendant's conduct, and (3) likelihood that a favorable decision will redress the injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  "The party invoking federal jurisdiction bears the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of the litigation."  Id. at 561.

Defendant argues that plaintiff cannot show injury because plaintiff alleges no damages other than attorney fees and investigative costs used to ascertain the identity of the website creator.  Injury in fact is an invasion of a legally protected interest that is concrete, particularized, and actual or imminent but not conjectural or hypothetical.  Id. A plaintiff may establish an injury "by creating a chain of inferences showing how defendant's false advertising could harm plaintiff's business."  TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 825 (9th Cir. 2011).  "Evidence of direct competition is strong proof" of injury in fact. Id. at 825-26.

The parties agree that they conduct business in the industry of healthcare services for correctional facilities and compete for contracts across the country. (Doc. 62 at ¶ 19; Doc. 93 at ¶ 19.)  The record contains evidence supporting the allegations that the statements on the http://cmsdoesnotcare.com website were false and that defendant participated in additional internet activity targeting plaintiff.  (See Doc. 106-7 at 20-21;

- 6 -

Doc. 106-8 at 3.) Plaintiff further alleges that it "has been or is likely to be injured as a result of the false statements either by direct diversion of sales or procurement of its services from itself to Wexford or by a loss of goodwill associated with its services." (Doc. 62 at ¶ 21.) Given the parties' direct competition and the evidence in the record supporting defendant's wrongful conduct, a likelihood of confusion may be inferred, which is sufficient to establish injury-in-fact for constitutional standing. (See Doc. 62 at ¶ 19; Doc. 93 at ¶ 19; Doc. 106-8.) Cf. Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 933-34 (8th Cir. 2012).

The circuit courts have recognized two tests for prudential standing for false advertising claims under the Lanham Act.[2] Am. Ass'n. of Orthodontists v. Yellow Book USA, Inc., 434 F.3d 1100, 1103-04 (8th Cir. 2006). Under the first test, "to have standing for a false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury." Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 873 (10th Cir. 1995). Under the second test, set forth by the Supreme Court of the United States in the context of the Clayton Act, courts consider several factors, including:

> (1) the nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"?; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages.

Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 563 (5th Cir. 2001).

Under the first test the parties have agreed that they compete. Competitive injury means that the injury is "harmful to the plaintiff's ability to compete with the defendant." Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1037 (9th Cir. 2005). "[W]hen plaintiff competes directly with defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing."

---

[2] On June 3, 2013, the Supreme Court of the United States granted certiorari in Lexmark Int'l, Inc. v. Static Control Components, Inc., 2013 WL 182751 (U.S. 2013), to resolve this split of authority.

TrafficSchool.com, Inc., 653 F.3d at 827. The record contains evidence supporting the falsity of the statements on the http://cmsdoesnotcare.com website, discussed in greater detail below. Thus, under the first test, plaintiff has established prudential standing.

Under the second test, the court first considers whether the alleged injury is "of a type that Congress sought to redress in providing a private remedy for violations of the [unfair advertising] laws." Proctor & Gamble Co., 242 F.3d at 563. "[T]he focus of the Lanham Act is on commercial interests that have been harmed by a competitor's false advertising, and in securing to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 234 (3d Cir. 1998). Plaintiff's allegations of injury mirror the language of Conte. (Doc. 62 at ¶ 21.) Further, the website, created at defendant's command, contained statements concerning plaintiff's treatment of its employees, customers, and prison security guards. (Doc. 102-14.) Proffered evidence supports plaintiff's claim of investigative and attorney fees, which may be awarded in false advertising actions. (Doc. 106-8 at ¶¶ 1-2.) Finally, no risk of duplicative damages or complexity in apportioning damages is present in this case.

Under either test, plaintiff has prudential standing to bring a false advertising claim under the Lanham Act.

**B. Falsity**

Plaintiff argues that the statements on the website are literally false. Defendant argues that the statements are mere puffery.

To prevail on a false advertising claim under the Lanham Act, a plaintiff must show "a false statement of fact by the defendant in a commercial advertisement about its own or another's product." Buetow, 650 F.3d at 1182. To establish this element, a plaintiff must show that the statement is a commercial claim that is literally and factually false; or a claim that is literally true or ambiguous but implicitly conveys a false impression, misleads due to context, or is likely to deceive consumers. United Indus.

- 8 -

Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998).  A third category, generally known as "puffery," which is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely," is not actionable under the Lanham Act.  Id. Examples include representations of product superiority that are vague or highly subjective.  Id.  "A literally false statement can be determined as a matter of law, but whether a statement is misleading is considered a matter of fact."  Allsup, Inc. v. Advantage 2000 Consultants Inc., 428 F.3d 1135, 1138 (8th Cir. 2005).

A literally false statement is a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact."  Ott v. Target Corp., 153 F. Supp. 2d 1055, 1069 (D. Minn. 2001).  "In assessing whether an advertisement is literally false, a court must analyze the message conveyed within its full context."  United Indus. Corp., 140 F.3d at 1180.  When a statement "can reasonably be understood as conveying different messages, a literal falsity argument must fail." Buetow, 650 F.3d at 1185.

Although plaintiff argues that several statements are false, plaintiff appears to rely primarily on the statement that the website's author was a "CMS insider".  Defendant argues that the statement is not literally false, relying on the definition of "insider" as  "a person who has knowledge of facts not available to the general public."  See Black's Law Dictionary (9th ed. 2009).  Specifically, defendant argues that it obtained knowledge of facts unavailable to the general public from plaintiff's employees and others involved in the transition process.

Significantly, Mark Hale, CEO and president of defendant, and Marlin Collingwood, president of the CHT Group, authored the website.  (Doc. 106-5 at 5; Doc. 106-6 at 10.)  The context of the website excludes both Mark Hale and Marlin Collingwood as the purported "CMS insider" and implies that the website's author was plaintiff's employee.  The introduction to the website states, "I've been a [CMS] insider for quite a while now," and "I decided to start this site to vent a little and give some of my insight into the CMS way of doing business."  (Doc. 106-8 at 4.)  The website further states that "[CMS's] actions in Maryland are now directly affecting me and many of my

colleagues and friends." (Id.) The term "colleague" means "a person with whom one works, especially in a profession or business." Oxford University Press, <u>Oxford Dictionaries</u>, http://oxforddictionaries.com/us/definition/american_english/colleague. Additionally, the website states, "Many of us know the security officers in Maryland and even they are looking forward to the change in vendors." (Id. at 5-6.)

Thus, the website states that the author was a member of a group of coworkers directly affected by plaintiff's actions in Maryland and had enjoyed insider status "for quite a while." Further, according to the website, this group of coworkers knew the Maryland security officers sufficiently to discern their opinion of the transition process. The website also implies a lack of affiliation with defendant by feigning uncertainty regarding defendant's location. (Id. at 5.) Conceivably, a group of coworkers other than plaintiff's employees could have possessed the characteristics matching the website's description. However, the court finds that Mark Hale's statement, or Marlin Collinwood's statement made under defendant's direction, that he belonged to any such group, is literally false. See Reckitt Benckiser Inc. v. Motomco Ltd., 760 F. Supp. 2d 446, 455 (S.D.N.Y. 2011) (finding that false attribution of authorship rendered documents literally false).

**C. Commercial Advertisement**

As discussed above, the false statement must concern defendant's or another's product in a commercial advertisement. For the commercial speech analysis, courts consider "(i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120 (8th Cir. 1999). "The presence of all three factors provides strong support for the conclusion that the speech in question is commercial." Id.

To qualify as a commercial advertisement, the statements must be "disseminated sufficiently to the relevant purchasing public within that industry." Id. at 1121. According to defendant, plaintiff fails to demonstrate that the website constituted a

commercial advertisement because as a few as two dozen people viewed the website and because plaintiff has produced no evidence that the viewers included anyone from the relevant purchasing public. Defendant's argument suggests that classification as a commercial advertisement turns on whether the statements were read rather than on the efforts to make such statements available. However, the inquiry focuses on the efforts made to distribute the statements rather than on the number of readers. As discussed by the Second Circuit:

> The ordinary understanding of both "advertising" and "promotion" connotes activity designed to disseminate information to the public. Thus, the touchstone of whether a defendant's actions may be considered "commercial advertising or promotion" under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market.

Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002). Here, defendant disseminated the statements to anyone with access to the internet by posting the statements on the internet. (Doc. 102-14.) The first factor weighs in favor of plaintiff.

The parties also dispute whether the website refers to products or services. The website states:

> CMS decided to protest the award and they were denied.
>
> This was even though their price was lower than the Wexford company, Maryland decided not to go with CMS. This says a lot regarding how unhappy Maryland was with the CMS services.

(Doc. 102-14 at 3.) Defendant acknowledges this statement but argues that the website did not refer to services in the normal context but to plaintiff's practices as an employer and the failure to cooperate with the transition process. In essence, defendant argues that the website states that Maryland declined to award the contract to plaintiff because plaintiff failed to cooperate with the transition process – the transition process that occurred only as a result of Maryland's decision to decline the award. Moreover, the website refers only to

plaintiff's treatment of employees that occurred subsequent to Maryland's initial decision. Defendant also suggests that "services" referred to plaintiff's relationship with the Maryland security officers rather than services as a healthcare provider. However, even assuming that any reader would construe "services" in this manner, the context of the website implies that working with security officers is part and parcel with providing healthcare services. The second factor also weighs in favor of plaintiff.

Regarding economic motivation, defendant states that it created the website "to facilitate the modest goal of transitioning services in Maryland after [Maryland] had announced its intent to award the contract to [defendant]." (Doc. 126 at 8.) Defendant also states that assisting the incoming healthcare vendor to ensure continuity of healthcare is standard in the industry. (Doc. 102 at ¶ 20.) Significantly, healthcare is the very service that defendant intended to provide Maryland pursuant to a contract similar to one that earned plaintiff over $60,000,000 dollars each year. (Doc. 102-2 at 5; Doc. 106-3 at 9.) Further, defendant states that specific transition transactions include employment of existing personnel, purchase of existing equipment and supplies, and assumption of existing leases. (Doc. 102 at ¶ 20.) In essence, defendant states that it intended the website to facilitate multiple economic transactions to meet the requirements of a financially lucrative contract. Moreover, circumstantial evidence, including defendant's relationship with plaintiff as a competitor and the website's content further support a finding of economic motivation. See Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F. Supp. 2d 1032, 1057-58 (D. Kan. 2006). The third factors weighs in favor of plaintiff.

Each factor of the balancing test weighs in favor of plaintiff. Accordingly, the court finds that the website constitutes commercial speech.

## D. Presumptions of Deception Materiality and Injury

The parties dispute the existence and effect of presumptions for the elements of deception, materiality, and injury. The Eighth Circuit has stated, "If a plaintiff proves that a challenged claim is literally false, a court may grant relief without considering whether the buying public was actually misled; actual consumer confusion need not be

proved." See Buetow v. A.L.S. Enterprises, Inc., 650 F.3d 1178, 1183 (8th Cir. 2011); United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998). Although the Eighth Circuit states that a finding of literal falsity renders consideration of actual deception unnecessary, at oral argument, defendant suggested and plaintiff conceded that the presumption was rebuttable, which finds some support in Eighth Circuit law. See Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1333 (8th Cir. 1997).

Defendant argues that the Eighth Circuit abrogated the deception presumption in Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C., 393 F.3d 755, 764 (8th Cir. 2005). The court disagrees. First, in Everest Capital Ltd., the Eighth Circuit addressed the presumption succinctly in the context of whether the district court abused its discretion by failing to provide a jury instruction explaining the presumption. Id. Second, the Eighth Circuit has spoken favorably of the presumption in later cases. Buetow, 650 F.3d at 1183.

In Porous Media Corp., the Eighth Circuit also reviewed the district court's use of the causation and injury rebuttable presumption, which the Eighth Circuit upheld as consistent with existing case law. Id. at 1331. The Eighth Circuit found the presumption of causation and injury appropriate only in "cases of false advertising where the plaintiff-competitor's product is specifically compared or referenced," referred to as "comparative advertising." Id. at 1335. The Eighth Circuit also required "proof of willful deception" for the presumptions of deception and causation and injury, although most Eighth Circuit cases require a finding of literal falsity to trigger the presumptions. Compare id. at 1336 with Buetow, 650 F.3d at 1183, United Indus. Corp., 140 F.3d at 1180; Rhone-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 516 (8th Cir. 1996). Taken literally, willful deception is not coextensive with literal falsity. Unable to rectify this discrepancy, the court determines that finding either willful deception or literal falsity is sufficient to trigger a presumption of causation and injury.

Although plaintiff cites no controlling authority regarding the presumption of materiality, several courts have recognized this presumption upon a finding of literal falsity. See e.g., Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 497 (5th Cir.

2000) (conflating materiality and actual deception); Filtration Solutions Worldwide, Inc. v. Gulf Coast Filters, Inc., 2010 WL 2134274, *6 (W.D. Mo. 2010); Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp., 348 F. Supp. 2d 165, 180 (S.D.N.Y. 2004); Genderm Corp. v. Biozone Laboratories, 1992 WL 220638, *2 (N.D. Ill. 1992). However, the weight of authority dissuades the court from presuming materiality even with a finding of literal falsity. Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1250-51 (11th Cir. 2002) (recognizing the split of authority); Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 312 n.10 (1st Cir. 2002); S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001). The creation of the deception presumption arose from concerns with the difficulty of obtaining proof. See Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 693 (6th Cir. 2000). By contrast, difficulty with obtaining proof is less likely to arise with the element of materiality, which may be determined by reference to the objectionable statements alone. See Johnson & Johnson Vision Care Inc., 299 F.3d at 1250 ("A plaintiff may establish this materiality requirement by proving that the defendants misrepresented an inherent quality or characteristic of the product.").

As set forth above, the website contains literally false statements, and defendant's statements refer to its competitor's services. The court determines that the rebuttable presumptions of deception and injury apply, which shifts the burden to defendant to prove the absence of deception and injury. See Porous Media Corp., 110 F.3d at 1333. However, the burden to show materiality remains with plaintiff.

**E. Deception**

Defendant must show that the statement did not actually deceive or have the tendency to deceive a substantial segment of its audience. Defendant notes that plaintiff has produced no evidence that any customer or potential customer saw the website or market research indicating the website's misleading nature. However, as stated above, defendant bears the burden of production at this summary judgment stage of the litigation. Defendant also cites to the statements of James McCourtney, plaintiff's senior

vice president, David Meeker, plaintiff's regional vice president, and Jill Danzilo, defendant's regional administrator, that they had never seen the posted website and knew of no one who had.  (Doc. 102-3 at 8, 35-36; 102-5 at 12; Doc. 102-41 at ¶ 10.) However, since anyone with access to the internet could have seen the website, the statements of three individuals are insufficient to show that there exists no genuine issue of material fact regarding actual deception.

Defendant further states, "During the approximately six months that it was posted, the website received approximately 20-25 visitors in total," and that at least the majority of the visitors consisted of representatives of plaintiff and defendant.  (Doc. 102 at ¶ 46.) Defendant relies primarily on the deposition of Marlin Collingwood.  (Doc. 102-8 at 11-12.)  Plaintiff responds that defendant and Collingwood do not cite any corroborating evidence nor did Collingwood explain the source of his information or his method of calculation.  Plaintiff also responds that the Yahoo! Finance web page for American Service Group, Inc. and the comment section for an online Baltimore Sun article each contained a link to the http://www.cmsdoesnotcare.com website, which, plaintiff argues, implies that website had additional visitors.

> The burden of proof is particularly relevant when the party with the burden of proof moves for summary judgment and the opposing party presents evidence contesting the veracity of the movant's evidence.  In this situation, if the testimony of a witness (as opposed to documentary evidence) is necessary to carry the movant's burden of proof, we look carefully at whether the witness is unbiased and competent, and whether his testimony is "positive, internally consistent, unequivocal, and in full accord with the documentary exhibits.  If the movant makes this showing, then the opposing party cannot force a trial merely to cross-examine the witness or in the hope "that something might turn up at the trial."  But where specific facts are alleged that if proven would call the credibility of the moving party's witness into doubt, summary judgment is improper," especially when the challenged testimony "is an essential element of the plaintiff's case."

United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn., 480 F.3d 841, 845 (8th Cir. 2007).

Assuming its credibility, defendant's statement regarding the website's viewership would prove a lack of actual deception. Moreover, given the duration of the website's life, defendant's statement could also support a lack of a tendency to deceive. However, Collingwood's testimony suffers several deficiencies.

At his deposition, Collingwood first testified that he could "confidently say" that the website received only 20 to 25 views, and he attributed ten views to defendant's representatives. (Doc. 102-8 at 11.) In contrast, Collingwood later characterized his estimate as "supposition" but testified that he knew that, according to the GoDaddy site, "the web traffic was minuscule." (Id. at 12.) He further testified that he assumed, based on the ordinary course of his business, that he checked the website's numbers two or three times per month through January or February but that the website remained live until June. (Id. at 12-13.) Collingwood did not testify unequivocally nor has defendant produced corroborating documentary exhibits. Moreover, even accepting Collingwood's testimony as true, the testimony does not account for the additional three or four months the website remained live. Further, links to the website on other websites, although not conclusive, increase the likelihood that others viewed the website. (Doc. 106-8 at 3; Doc. 120-3) Finally, as noted by plaintiff, one could infer that the website deceived at least one person based on a comparison of the timing of the Baltimore Sun post and an email received by defendant from a Baltimore Sun reporter, which requested information regarding the contract and refers to "a source with the current vendor." (Doc. 103-1.)

Accordingly, deception remains a genuine issue of material fact.

**F. Materiality**

Plaintiff must show that "the deception is material, in that it is likely to influence the purchasing decision." Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1250 (11th Cir. 2002). "A plaintiff may establish this materiality requirement by proving that the defendants misrepresented an inherent quality or characteristic of the product." Id.

As discussed above, many of the website's statements pertain to plaintiff's conduct during the transition process, which defendant argues does not concern plaintiff's product or service. However, resolving whether plaintiff's services include assisting with the transition of another vendor is unnecessary because even statements that do not concern plaintiff's services could influence a purchasing decision. See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1272 (10th Cir. 2000) ("products are often marketed and purchased not only on the basis of their inherent utility, but also for the images they project and the values they promote"). Defendant also argues that establishing materiality requires evidence that the website impacted the decision of customers. However, as set forth above, courts allow plaintiffs to establish materiality "by proving that the defendants misrepresented an inherent quality or characteristic of the product," Johnson & Johnson Vision Care, Inc., 299 F.3d at 1250, which allows plaintiffs to establish materiality based on the content of the statement and undermines defendant's contention that evidence of consumer decision making is required.

The element of materiality is tied to deception, and thus becomes relevant only if defendant cannot overcome the rebuttable presumption of deception. Presuming that the website deceived plaintiff's customers, the court finds that a reasonable fact-finder could find materiality based on the website content, which includes declarations that plaintiff's executives stated that they do not care about customer preferences, that Maryland security officers repeatedly complained about plaintiff, and that plaintiff lied to its employees and its customer, Maryland. (Doc. 102-14.) Materiality remains a disputed issue of material fact.

**E. Injury**

For the injury and causation element, a plaintiff must show that "the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." Buetow v. A.L.S. Enterprises, Inc., 650 F.3d 1178, 1182 (8th Cir. 2011). Plaintiff does not concede the existence of lost profits or goodwill but, nevertheless, relies primarily on

the approximately $60,000 allegedly incurred to remove the website, which plaintiff characterizes as "damage control expenses." Additionally, plaintiff relies on the presumption of injury as a result of literal falsity.

The statutory language allows for damage control expenses, but the Eighth Circuit has not addressed them. See 15 U.S.C. §§ 1117, 1125. As noted by the Sixth Circuit, damage control expenses and injunctive relief share a similar purpose – "to prevent such things as lost sales, lost profits, and lost good will." Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 691 (6th Cir. 2000). The court agrees with the reasoning of Balance Dynamics Corp., in which the Sixth Circuit concluded that, "because a company may justifiably act before it actually sustains injury, standards similar to those applicable to injunctive relief are appropriate where plaintiffs seeks to recover damage control expenses." Id. at 692. "As is the case with plaintiffs seeking injunctive relief, plaintiffs engaging in damage control are still at a stage where substantial uncertainty exists as to the extent of the business harm being inflicted by the false advertising." Id. at 691. Such substantial uncertainty contrasts heavily with the information available at summary judgment and trial, which the fact finder may consider to evaluate likelihood.

Defendant offers the lack of evidence produced by plaintiff showing lost profits or goodwill and that Maryland extended the contract with plaintiff after defendant posted the website. As discussed above, the burden to produce evidence rests with defendant. Further, although the Maryland extension arguably may be sufficient to show that plaintiff lost no profits or goodwill with Maryland, such evidence does not foreclose the possibility that plaintiff lost profits or goodwill from other customers. The court finds that injury, both actual and likely, remains a disputed issue of material fact.

Defendant characterizes the expenses as incurred solely to manufacture damages for litigation rather than to mitigate injury. Defendant also argues that plaintiff knew that defendant authored the website ten days after the website posted and that the appropriate mitigation effort was to contact defendant. Plaintiff responds that although it considered defendant a suspect, the identity of the website's author remained a mystery until the deposition of Marlin Collingwood on July 19, 2011. Resolution of these arguments turns

on plaintiff's intent and the reasonableness of its conduct, which remain genuine issues of material fact for a jury to decide.

**F. Permanent Injunction**

Defendant argues that plaintiff's request for a permanent injunction is moot because Marlin Collinwood removed the website about two years ago and that no evidence suggests that defendants will repeat similar conduct.

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). "The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." Bank One, Utah v. Guttau, 190 F.3d 844, 847 (8th Cir. 1999). "In general, a pending claim for injunctive relief becomes moot when the challenged conduct ceases and there is no reasonable expectation that the wrong will be repeated." Beaulieu v. Ludeman, 690 F.3d 1017, 1024 (8th Cir. 2012). However, in cases of voluntary cessation, a more stringent standard of mootness applies. Missouri Prot. & Advocacy Servs., Inc. v. Carnahan, 499 F.3d 803, 811 (8th Cir. 2007). Specifically, "[a] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id.

Defendant admits the creation of the http://www.cmsdoesnotcare.com website, but defendant's affiliation with the link postings on the Yahoo! Finance and Baltimore Sun websites and the http://www.phscmsmergerconcerns.com website remains a disputed fact relevant to the court's consideration of the Dataphase factors and the likelihood that defendant will engage in similar conduct. Stated otherwise, plaintiff's request for a

permanent injunction is not moot because whether defendant will engage in similar conduct is not "absolutely clear."

## VI.  CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant Wexford Health Sources, Inc. for summary judgment (Doc. 100) is denied.

**IT IS FURTHER ORDERED** that the motion of plaintiff Corizon, Inc. for summary judgment (Doc. 105) is sustained in part and denied in part.

**IT IS FURTHER ORDERED** that the motion of plaintiff Corizon, Inc. to strike the affidavit of Elaine Gedman (Doc. 121) is denied as moot.

　　　　　　　　　　　　　　　　　　　/S/   David D. Noce   　　
　　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on July 23, 2013.